# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 05 C 3758 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| TAKEDA PHARMACEUTICAL ) | |
| COMPANY LIMITED (formerly ) | |
| known as TAKEDA CHEMICAL ) | |
| INDUSTRIES, LTD.) and TAKEDA ) | |
| AMERICA HOLDINGS, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Abbott Laboratories has sued Takeda Pharmaceutical Company Limited and Takeda America Holdings, Inc. (collectively, "Takeda") for breach of fiduciary duties. Takeda has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(3) for improper venue. For the reasons provided in this Memorandum Opinion and Order, the motion is granted.

### The Legal Standard

On a Rule 12(b)(3) motion to dismiss, plaintiff bears the burden of proving that venue is proper. *First Health Group, Corp. v. Sanderson Farms, Inc.*, No. 99 C 2926, 2000 WL 139474, at *2 (N.D. Ill. Jan. 28, 2000). The Court may examine facts outside the complaint to determine whether venue is proper but must resolve all factual conflicts and draw all reasonable inferences in plaintiff's favor. *Id.*

## Facts

In 1977, Abbott and Takeda formed TAP Pharmaceutical Products, Inc. ("TAP"), an Illinois general partnership, through a Basic Agreement. (Compl. ¶ 3; Shinha Decl., Ex. 2, 8/3/77 Basic Agreement, Ex. 2, App. A, Art. P'ship, Art. I.) The Basic Agreement says TAP was formed to "perform research and development on certain Abbott and Takeda pharmaceutical compounds in Canada and the U.S." and that Takeda and Abbott will "share equally in [TAP's] profits and/or losses." (Shinha Decl., Ex. 2, 8/3/77 Basic Agreement Preamble & § 2.3; see id., App. A, Art. P'ship, Art. VIII (agreeing to allocate profits equally).) The Basic Agreement also says that it "shall be governed by the laws of the State of Illinois." (Shinha Decl., Ex. 2, 8/3/77 Basic Agreement § 6.6.)

In 1985, Abbott and Takeda entered into another agreement "to supplement the provisions of the Basic Agreement." (Shinha Decl., Ex. 3, 4/17/85 Supplemental Agreement Preamble.) Among other things, the Supplemental Agreement requires a series of transactions to transform the parties' Illinois general partnership into its current form, a closely-held Delaware corporation. (See id. §§ 2.1-6.3.) Takeda and Abbott each own fifty percent of the shares of TAP. (Compl. ¶ 4.)

The Supplemental Agreement is the shareholders' agreement between Abbott and Takeda. (Shinha Decl., Ex. 8, TAP Holdings, Inc. Stock Certificate at 2 (stating that "[t]he two (2) entities which are stockholders of this corporation have set forth in a separate instrument the basis upon which each such entity has agreed to become a stockholder of this corporation. Such separate instrument is the Supplemental Agreement dated April 17, 1985, as amended . . . ."). The Agreement enables TAP to "establish independent manufacturing, distribution, marketing or sales organizations" and permits it to purchase "bulk product" from Abbott or Takeda for use in

2

those enterprises. (Shinha Decl., Ex. 3, 4/17/85 Supplemental Agreement § 9.2.) However, the Agreement requires TAP to choose a bulk supplier "on the basis of the economic advantages" to TAP. (*Id.*)

The Agreement also requires Abbott and Takeda to "utilize their voting power in [TAP] in such a manner as to effectuate the intent of the Basic Agreement and this Supplemental Agreement." (*Id.* § 10.1.) The Supplemental Agreement incorporates the choice-of-law provision of the Basic Agreement (*see id.* § 10.6 (designating Illinois law as controlling law)) and contains the following provision:

> (a) Abbott and Takeda agree that, in the event of a dispute between them arising from, concerning, or in any way related to this Agreement, the parties shall undertake good faith efforts to resolve the same amicably between themselves. In the event that any such dispute cannot be resolved amicably within ninety (90) days after notice by either party to the other, and either party files an action, suit or proceeding ("action") following such ninety (90) day period to resolve such dispute, the parties shall proceed exclusively in accordance with the following provisions of this section.
>
> (b) If Takeda is the party which files such action, it shall do so in the Circuit Court of Lake County, Waukegan, Illinois, or in the United States District Court for the Northern District of Illinois, Eastern Division, Chicago, Illinois as Takeda shall determine. Takeda hereby covenants and agrees to refrain from filing any such action in any other court, either within or outside of the United States.
>
> (c) If Abbott is the party which files such action, it shall do so in the Osaka District Court in Osaka, Japan, or in the Tokyo District Court in Tokyo, Japan, as Abbott shall determine. Abbott hereby covenants and agrees to refrain from filing any such action in any other court, either within or outside of Japan.
>
> . . .
>
> (e) Takeda and Abbott each hereby waive and agree not to assert by way of motion, as a defense, or otherwise in any such action brought in accordance with paragraph (b) or (c) of this section, any claim that it is not personally subject to the jurisdiction of such court, that the action is brought in an inconvenient forum, that the venue of the action is improper, or that this section may not be enforced in or by any such court.

3

(*Id.* at § 10.5.)

In June 1995, Takeda and TAP entered into an agreement in which Takeda became TAP's supplier of Lansoprazole, which TAP markets as Prevacid. (*See* Shinha Decl., Ex. 6, 6/7/95 Takeda/TAP Lansoprazole Supply Agreement; Compl. ¶ 10.) The agreement made Takeda TAP's exclusive Lansoprazole supplier for a ten-year term. (Shinha Decl., Ex. 6, 6/7/95 Takeda/TAP Lansoprazole Supply Agreement § 2.1; Compl. ¶ 11.)

In October 2003, TAP's management decided to look for other, less expensive, sources of Lansoprazole. (Compl. ¶ 13.) In June 2004, TAP's president told Takeda that it had found a Lansoprazole supplier that would charge less than Takeda. (*Id.* ¶ 17.) TAP told Takeda that it would use the new supplier in May 2005, when the Takeda/TAP Agreement expired, unless Takeda reduced its price. (*Id.*)

Abbott says Takeda did not want to lower its price or lose the supply contract. As a result, Takeda proposed that the existing agreement be extended for another ten-year term, and threatened to disrupt TAP's supply of Lansoprazole if it did not quickly agree to the extension. (*Id.* ¶¶ 18, 20.)

On August 4, 2004, TAP's president called for a board of directors meeting to resolve this and other issues. (*Id.* ¶ 22.) Takeda refused to allow its directors, who comprised half of the TAP board and whose presence was necessary for the board to take any action, to schedule or attend a meeting. (*Id.* ¶ 23.)

To avoid losing its Lansoprazole supply, Abbott capitulated to Takeda's demands and, on December 17, 2004, TAP signed another ten-year supply agreement with Takeda. (*Id.* ¶¶ 26-27.)

On June 28, 2005, Abbott filed this suit, claiming that Takeda's conduct in connection with the Lansoprazole supply contracts breached the fiduciary duties it owes to Abbott and TAP.

4

Takeda contends that this suit must be dismissed because the forum-selection clause in the Supplemental Agreement requires Abbott to file suit in Japan.[1]

## Discussion

Abbott has invoked this Court's diversity jurisdiction. (Compl. ¶ 7.) Federal courts sitting in diversity apply the choice of law rules of the forum state. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1184 (7th Cir. 1996). One of Illinois' choice of law rules is that a contractual choice of law clause will be enforced as long as the contract is valid. *Id.* at 1185. Neither party argues that the Basic or Supplemental Agreement is invalid. Thus, the Court will follow the choice of law provision in the Basic Agreement, which is incorporated in the Supplemental Agreement (*see* Shinha Decl., Ex. 2, Basic Agreement § 6.6; *id.*, Ex. 3, Supplemental Agreement § 10.6.), and use Illinois law to interpret the contracts. *See Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 374 (7th Cir. 1990) (stating that validity of forum-selection clause is an issue of federal law but noting that: "Validity and interpretation are separate issues, and it can be argued that as the rest of the contract in which a forum selection clause is found will be interpreted under the principles of interpretation followed by the state whose law governs the contract, so should that clause be.").

---

[1] The Court agrees with Takeda that the Basic and Supplemental Agreements, not the 1987 research and development ("R&D") contract as Abbott urges, apply to this suit. The 1987 contract pertains only to R&D, not to the supply of bulk product, the activity on which this suit is based. Further, the 1987 contract does not purport to amend or supersede the Supplemental Agreement, which is designated as the shareholders' agreement for TAP. (*See* Abbott Mem. Opp'n Mot. Dismiss, Ex. 1, 3/1/87 R&D Agreement; Shinha Decl., Ex. 8, TAP Holdings, Inc. Stock Certificate at 2.)

5

The Illinois Supreme Court has yet to decide when a contract's forum-selection clause will apply to related, non-contract claims. The state appellate court, however, like the Seventh Circuit, has held that "forum selection clauses apply to tort claims which require interpretation of the contract." *Boatwright v. Delott*, 642 N.E.2d 875, 877 (Ill. App. Ct. 1994); *see Omron Healthcare, Inc. v. MacLaren Exports, Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) (holding that "all disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement for purposes of . . . . a forum-selection clause."). Accordingly, if resolution of Abbott's claims will require interpretation of the parties' contracts, the forum-selection clause applies.

Abbott alleges that Takeda breached its fiduciary duties by diverting profits to itself by selling Lansoprazole to TAP at an inflated price and by using its power over half of TAP's board to prevent it from obtaining a new Lansoprazole supplier. (Compl. ¶ 11.) Abbott's claims arise directly from the parties' contracts. The Basic Agreement states that Abbott and Takeda will "share equally in [TAP's] profits" and the Supplemental Agreement states that the closely-held corporation into which TAP evolved "will be owned in equal shares by Abbott and Takeda." (Shinha Decl., Ex. 2, 8/3/77 Basic Agreement § 2.3; *id.*, Ex. 4, 10/7/86 Amendment to Supplemental Agreement.) Moreover, the Supplemental Agreement requires Takeda to "utilize [its] voting power in [TAP] in such a manner as to effectuate the intent" of the Basic and Supplemental Agreements. (*Id.*, Ex. 3, Supplemental Agreement § 10.1.) Thus, though Abbott complains that fiduciary duties have been breached, its claims are grounded in the contracts and cannot be resolved without interpreting them. The forum-selection clause, therefore, applies. *See Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 889 (7th Cir. 2004) ("[T]he existence of multiple remedies for wrongs arising out of a contractual relationship does

6

not obliterate the contractual setting, does not make the dispute any less one arising under or out of or concerning the contract, and does not point to a better forum for adjudicating the parties' dispute than the one they had selected to resolve their contractual disputes.").

Even if the clause covers this dispute, Abbott says it should not be enforced. Under federal law, which determines the validity of such provisions, *see Northwestern National Insurance Co.*, 916 F.2d at 374, a forum-selection clause is unenforceable only if it is the result of "fraud, undue influence or overweening bargaining power," if the forum selected is "so gravely difficult and inconvenient that the complaining party will for all practical purposes be deprived of its day in court" or if enforcing the clause will violate "a strong public policy of the forum in which the suit is brought, [as] declared by statute or judicial decision." *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993) (internal quotation marks, alterations and citations omitted). Abbott says enforcing the clause would deprive it of its day in court because Japanese courts do not recognize fiduciary duty claims in this context. (Abbott Mem. Opp'n Mot. Dismiss at 8; *see id.*, Exs. 3 & 4, Muto & Kakinuki Affs.) Moreover, Abbott says, even if such claims were allowed, Japanese courts "would afford neither meaningful discovery nor a viable remedy" for them. (Abbott Mem. Opp'n Mot. Dismiss at 8.)

The Court disagrees. The extent to which Japanese law imposes fiduciary duties on joint venturers matters only if a Japanese court would apply Japanese law to this dispute. That assumption is not supported by the record. Neither of Abbott's Japanese law experts says that Japanese courts refuse to enforce contractual choice of law provisions or that they apply Japanese law to every dispute that comes before them, regardless of its origin. Thus, the Court

has no reason to conclude that a Japanese court will disregard the parties' agreement with respect to the controlling law and dismiss Abbott's claims as non-cognizable under Japanese law.[2]

The Court is also not persuaded that the Japanese discovery process is so deficient that it would effectively deprive Abbott of its day in court. Though the Japanese process, as described by Abbott's experts, is more restrictive than that of this Court, there is no question that Japanese law has provisions for the production of documents, depositions and interrogatories. (*See* Abbott Mem. Opp'n Mot. Dismiss, Ex. 3, Muto Aff. ¶¶ 3-7; *id.*, Ex. 4, Kakinuki Aff. ¶¶ 3-9.) Because Abbott would be entitled to conduct meaningful discovery in Japan, the fact that the Japanese process is less expansive than that of this Court is not a basis for disregarding the forum-selection clause. *See Raskin, S.A. v. Datasonic Corp.*, No. 86 C 7596, 1987 WL 8180, at *2 (N.D. Ill. Mar. 16, 1987) ("The procedural variances between the United States' common law system and foreign civil law systems have been considered by many courts, and their rulings are consistent that such variances do not negate forum selection clauses . . . .").

Abbott's last argument is that it has no "viable remedy" in the Japanese courts because they will not issue an injunction, order an accounting or grant punitive damages, three of the

---

[2]Even if Abbott had shown that the Japanese courts would not hear its breach of fiduciary duty claims, that would not necessarily defeat the forum-selection clause:
> "It defies reason to suggest that a plaintiff may circumvent forum selection . . . merely by stating claims under laws not recognized by the forum selected in the agreement. A plaintiff simply would have to allege violations of *his country's* tort law or *his country's* statutory law or *his country's* property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction. We refuse to allow a party's solemn promise to be defeated by artful pleading. In the absence of other considerations, the agreement to submit to . . . the jurisdiction of the English courts must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum."

*Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 211 (7th Cir. 1993) (quoting *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 (2d Cir. 1993)) (emphasis in original).

remedies Abbott seeks. (Abbott Mem. Opp'n Mot. Dismiss at 8; *id.*, Ex. 3, Muto Aff. ¶¶ 8-9.) The question is not, however, whether the Japanese courts can afford Abbott every remedy it seeks, but whether they can give Abbott any remedy at all. *See Roby*, 996 F.2d at 1363 ("[T]he question is whether the application of the foreign law presents a danger that the [plaintiffs] will be deprived of *any* remedy . . . ." (quotation omitted) (emphasis in original)). Abbott's expert confirms that there are remedies available in Japanese courts: compensatory damages and reimbursement of litigation expenses. (Abbott Mem. Opp'n Mot. Dismiss, Ex. 3, Muto Aff. ¶¶ 8-9.) Enforcing the forum-selection clause will not, therefore, deprive Abbott of a remedy.

Even if the forum-selection clause is valid and applies to this dispute, Abbott says the clause is just one factor for the Court to consider in determining whether venue is proper here. Also relevant, in Abbott's view, are the convenience of third-parties and the interests of justice.[3] (Abbott Mem. Opp'n Mot. Dismiss at 11-12.)

Even if that is true, an issue we do not decide, it would not further Abbott's cause. Abbott contends that litigating the case in this Court would be more convenient for non-party witnesses because "all of the officers, managers, employees, and documents of the key third-party – TAP" are here. (Abbott's Mem. Opp'n Mot. Dismiss at 14.) Abbott has not, however, made any effort: (1) to identify specifically the TAP employees not under the control of Abbott or Takeda who would be required to testify in this case; (2) identify specifically the TAP documents located here that would be required for trial; or (3) discuss the difficulty or ease with which any TAP documents needed for trial could be sent to Japan. Absent a specific showing

---

[3] Wisely, Abbott does not argue about its own inconvenience as the forum-selection clause expressly waives that argument. (*See* Shinha Decl., Ex. 3, 4/17/85 Supplemental Agreement § 10.5(e) ('Takeda and Abbott each hereby waive and agree not to assert . . . that the action is brought in an inconvenient forum . . . .")

that litigating this case in Japan would work a hardship on third parties, their convenience is not a basis for nullifying the forum-selection clause. *Cf. Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293-94 (7th Cir. 1989) (holding, in the context of a 28 U.S.C. § 1404 motion to transfer venue, that movant's failure to provide "affidavits, depositions, stipulations, or any other type of document containing facts tending to establish who (specifically) it planned to call or the materiality of that testimony" precluded a finding that the designated venue was inconvenient for witnesses).

Similarly, even if the interests of justice are relevant, they do not favor Abbott's position. As explained above, enforcing the forum-selection clause would not "relegate plaintiff to a Japanese proceeding that would not provide a meaningful remedy for defendants' [alleged] wrongdoing," as Abbott contends. (Abbott Mem. Opp'n Mot. Dismiss at 14.) Moreover, though a Japanese court may have to apply law with which it is unfamiliar, that is an insufficient basis for invalidating a forum-selection clause. In the words of the Seventh Circuit:

> Omron tells us that [public policy] favor[s] sending disputes to courts that have the expertise to resolve them, and ensuring that courts with the interest of Americans at heart interpret laws designed for the protection of American consumers. Notice that neither of these policies has a secure footing in any statute. Public-policy arguments depend on the fact that "no court will lend its aid to one who founds a cause of action upon an immoral or illegal act." *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 42, 108 S. Ct. 364, 373, 98 L. Ed. 2d 286 (1987). Contracts that violate the rights of third parties aren't enforced; neither are agreements designed to get 'round statutes that protect the contracting parties from their own improvidence. But litigating in England is neither immoral nor illegal, and no law or policy of the United States demands that every dispute be litigated in the tribunal with the most experience – if that were so, jurisdiction based on diversity of citizenship would be abolished (for state courts have more experience with their own law than federal courts do), federal defenses to claims filed in state court would all be removed to federal court, and the courts of the United States would disclaim any power to adjudicate disputes under foreign law.

*Omron Healthcare, Inc.*, 28 F.3d at 603-04. Thus, the interests of justice will not be offended by enforcing the clause.

In sum, Abbott is a sophisticated entity that agreed to include the contested forum-selection clause in the contracts that governed its relationship with Takeda and TAP. Those agreements explicitly require Takeda to share TAP's profits equally with Abbott and to use its voting power to further that goal. Those are precisely the obligations that Abbott now claims Takeda violated, rendering the forum-selection clause applicable to this case. Moreover, because Abbott has failed to show that the clause is unenforceable, it must abide by the agreement it negotiated and litigate these claims in Japan.

## Conclusion

For the reasons stated above, Takeda's Rule 12(b)(3) motion to dismiss [doc. no. 18] is granted. This case is dismissed without prejudice to refiling in an appropriate Japanese court, and is hereby terminated.

**SO ORDERED.**  ENTERED: 2/24/06

HON. RONALD A. GUZMAN
United States District Judge